UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No.: 05-308 (GK)** |
| | : | |
| **JOHNNY LEE LUCAS,** | : | |
| | : | |
| **Defendant.** | : | |

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

    The United States, by and through its attorney, Kenneth L. Wainstein, the United States Attorney for the District of Columbia, hereby submits its memorandum in aid of sentencing. In support of this pleading, the government makes the following representations:

**INTRODUCTION**

    On February 17, 2006, the defendant pled guilty to Count Two of the indictment charging him with one count of unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime punishable by imprisonment for a term exceeding one year, in violation of Title 18, U.S.C. section 922(g)(1). The facts surrounding the guilty plea are that on or about May 21, 2005, MPD officers received a radio run for a man with a gun inside a red Volkswagen in the rear of 1140 North Capitol Street, NW. As the officers drove into the area, they saw some men walk away from a red Volkswagen and enter an apartment building. Witnesses in the area told the officers that the men who had walked away from the car were always selling drugs from it. The officers continued to watch the car, and the defendant and another person came out of the building and drove off in the car. The officers stopped the car, asked the defendant to step out of it, and inquired as to whether he had any drugs or weapons on him. The defendant said that he had his prescription medicine, and

consented to a search of his person. The officers patted him down, and felt two pill bottles in his right front pants pocket. When they recovered the bottles, they found that one was empty, and one contained 10 Oxycontin pills. The labels on the bottle indicated that they belonged to Lashawn Harrison. The defendant then said that the prescription was for his wife, but they were separated, and he could not reach her. The officers also recovered a blank Howard University Hospital prescription pad from defendant's pants pocket. The defendant was not arrested on this occasion. However, the officers obtained a search warrant for the defendant's apartment, which was in the building that he had come from to enter the car. This warrant was executed on June 10, 2005. As a result of the search warrant, officers recovered a loaded .38 caliber revolver next to an empty Oxycontin bottle, and $150. The pistol was missing its pistol grips, which were also found in the apartment. Also recovered were 41 rounds of .38 caliber ammunition, 34 rounds of .380 caliber ammunition, three other empty Oxycontin bottles in the names of other people, blank checks, and a number of outdated prescriptions scripts in the name of the defendant and other people, as well as rental receipts for the apartment in the defendant's name.

Defendant proceeded to litigate his motion to suppress in this case, which was denied, and subsequently entered his plea of guilt to the sole charge in the indictment. His base offense level in this case is 20, minus a 2 level downward adjustment for acceptance of responsibility, resulting in a base level of 18. Defendant's prior criminal record places his Criminal History Category at level IV. Thus, his Sentencing Guideline Range is 41 to 51 months.[1]

---

[1] The presentence report writer correctly stated Mr. Lucas' criminal history category in paragraph 28 of the report (pg 6), but incorrectly states it in paragraph 57 (pg 12). The correct criminal history category is IV, consequently, with his offense category as 18, Mr. Lucas' guideline range is 41-51 months.

The defendant requests a downward departure from the Guidelines sentencing range, stating that his terminal illness warrants that he should be treated differently than others who commit the same crime. Defendant states that as a result of his self-inflicted drug abuse and the resulting physical and medical conditions, he should not have to be punished by incarceration for his crimes. Rather, he states that he should be placed on probation with home confinement, drug testing, and treatment. The government submits that the defendant has not even attempted to show that his illnesses cannot be treated by the Bureau of Prison medical facilities, and that in fact, the evidence is to the contrary. The government further submits that the defendant's prior conduct while on pretrial release in this case has made it clear to the Court and to the parties that he is literally incapable of successfully participating in any community-based Court-ordered supervision. Finally, the defendant's status as a long term abuser of heroin and other drugs, as well as his complete failure to participate successfully, or even meaningfully in any drug treatment programs, indicates that home confinement, drug testing and treatment will only be a waste of precious Court resources in his case.

**Defendant's Illnesses can be treated and accommodated by prison facilities**.

There is no doubt that Mr. Lucas suffers from several serious medical and physical conditions, all of which have been enumerated in many previous court pleadings and hearings and will not be repeated here. However, there is simply no indication in the record in this case that his conditions cannot be accommodated by prison medical personnel and facilities. In fact, the record is to the contrary. At a hearing on the government's motion to revoke Mr. Lucas' bond in this case held on January 6, 2006, the question of the District of Columbia Jail's ability to care for Mr. Lucas in light of his conditions was fully explored. Counsel for both parties were directed by Magistrate

Judge Robinson to contact the appropriate representatives of the District of Columbia Jail to determine whether the defendant's conditions could be accommodated and treated by the jail's medical facilities and staff. The parties spoke with Brenda Baldwin-White, the acting general counsel for the Jail, as well as Dr. Akal, a medical doctor who worked with the jail population. The parties learned that the jail did in fact currently have or has in the past had people there who suffered from the same conditions as Mr. Lucas, and has been able to treat them and accommodate their conditions. The only limitation noted by Dr. Akal was that the jail is not set up to perform chemotherapy, which doesn't appear to be indicated in Mr. Lucas' case. Basically, the doctor made it clear that while the jail may or may not employ every specific medicine that the defendant may take currently, that the doctors at the jail facilities would perform their own evaluation of Mr. Lucas, and that while some drugs may be substituted for others, that the jail would be able to provide medications that would adequately address and treat Mr. Lucas' condition. As the Court is no doubt aware, this is clearly within the range of standard and acceptable medical practice. Any doctor who treats a new patient would of course make himself aware of the patient's current medical regimen and medical and treatment history. However, that doctor would also reserve the right to evaluate the patient for himself and make an independent assessment of the treatment needs. Again, oftentimes drugs are substituted or changed for a variety of medically appropriate reasons, such as generic versus name brand, side effects or other type of interactions, and this practice also falls within the realm of sound medical practice. There is simply no basis on this record either suggested by counsel or that exists in fact, to believe that Mr. Lucas would not get the treatment that he deserves while incarcerated. (See Bond Hearing Transcript pages 95 through 104).

**Home confinement, drug testing and treatment are not appropriate in Mr. Lucas' situation.**

Mr. Lucas is simply not amenable to any community based punishment or treatment options, and these precious resources should not be wasted on him. He has proven time and time again that he cannot be adequately supervised by Court personnel. At the bond hearing on January 6, 2006, the issue of Mr. Lucas' performance in the community was exhaustively laid out. (See transcript pp. 61 - 66 and 105-109) In fact, the very reason for the government's bond revocation motion was Mr. Lucas' new arrest for possession of cocaine while on community-based supervision. Since that bond hearing, the Court is also well aware of Mr. Lucas' spotty attempts to bring himself into compliance with the Court's orders and directives. Notably, at one point during the interim between the bond revocation hearing and the upcoming sentencing hearing, the defendant became the subject of a bench warrant due to his failure to appear in Court as required. The government notes that there are many people who are under the Court's supervision or who are in need of the services offered during such supervision, and that both the Pre-trial Services personnel and the Probation office personnel work very hard to provide these scarce resources to people who make excellent use of the opportunities that these services provide. The defendant has been offered these resources many times between the time he brought himself under the auspices of the criminal justice system and it has never been successful. Consequently, it is time to stop wasting these precious community based resources on him, and preserve them for someone who may truly benefit.

**Leaving Mr. Lucas in the community will not benefit him or the community.**

Defendant notes in his sentencing memorandum that his life is filled with pain and despair, and that he spends his time either receiving medical attention, sitting in his apartment alone, or seeking to somehow feed his heroin habit. Now that Mr. Lucas has once again brought himself into

5

the criminal justice system, it would be a disservice to the system and to Mr. Lucas to leave him to that life. Mr. Lucas is still a relatively young man. At 47 years old, with his illness under appropriate control, he still has much to offer to himself and to the community. The Bureau of Prisons has many programs in its different facilities wherein inmates acquire skills and education. It also provides opportunities for inmates to participate in supporting themselves and giving back to the community. Moreover, the Bureau has counseling and support programs for those who suffer from depression, illness, or other conditions. Rather than having Mr. Lucas waste government and Court resources as he comes in and out of Court having violated his community supervision yet again, it would be much better for Mr. Lucas and the community to have him serve his sentence, get the appropriate medical treatment, and avail himself of any other personal enrichment programs that may be provided to him. In other words, if he is so inclined, Mr. Lucas can use his time while incarcerated as many other people in his situation do–by doing what he can and using the resources available to him to make himself a better person. This would be far better than having Mr. Lucas remain in the community, coming back and forth before the Court on violations of release, and chasing his next heroin fix.

     The government is not unsympathetic to Mr. Lucas and his plight. The government only notes that in addition to consideration of Mr. Lucas's situation, there must also be a concern for the protection of the community and the appropriate allocation of community resources. Placing Mr. Lucas in a community based supervision program at this time will not accommodate either goal, and he should be incarcerated.

**Defendant should be sentenced within the guidelines**

The government maintains that a guidelines departure, or a sentence outside guidelines would be inappropriate because such a sentence in this case would not comport with the three main categories of sentencing factors: the nature of the offense, the history and characteristic of the defendant, and the needs of the public. United States v. Ranum, 353 F.Supp. 2d. 984, 989 (E.D. Wis. 2005)

Possession of a firearm in the District of Columbia is a serious offense, especially by a person who previous contacts with the criminal justice system have earned him a criminal score of 8. Moreover, the Court should also consider the fact that the defendant clearly has the type of clandestine connections which would permit a convicted felon to illegally obtain a firearm and ammunition.

As noted in the Defendant's sentencing memorandum, there is absolutely no reason to believe that the defendant's days on community supervision will involve anything other than using heroin. There has been absolutely no effort to date on defendant's part to take any interest in his own life, or to take an interest in the life of anyone other than himself. If he continues as he has, with no intervention, merely being left alone in his current condition as a show of "compassion and mercy" as requested in his memorandum, both the community and the defendant will continue to suffer.

The Sentencing Guideline range is not only presumptively reasonable, for the reasons outlined above, but it is reasonable and appropriate for this defendant based on the facts of this case. The defendant possessed a .38 caliber firearm along with ammunition. While the remaining count against him will be dismissed as per the plea agreement in this case, the fact also remains that he had in his apartment all of the indicia of a person who acquires or traffics in the procurement of drugs

illegally. Defendant had an additional box of ammunition for his weapon, loose rounds of ammunition, 4 empty Oxycontin bottles in other people's names, blank checks, and outdated prescriptions for himself and other people. At the time of the stop that gave rise to the search warrant for his apartment, defendant was in possession of a book of blank prescription sheets from Howard University Hospital.

For all of the aforementioned reasons, including defendant's record of non-compliance amassed during during the pendency of this case, the government requests that the defendant 's request for a departure be denied, and that the defendant be sentenced to the low end of the guidelines in this case.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY


_____/s/_____
WANDA J. DIXON
ASSISTANT UNITED STATES ATTORNEY
Organized Crime and Narcotics Section
555 Fourth Street NW, Fourth Floor
ROOM 4122
Washington, D.C. 20530